**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHRISTINA GRASTY, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 21-2476 |
| | : | |
| DAVITA, INC. D/B/A DAVITA SOUTH | : | |
| BROAD STREET DIALYSIS. | : | |

**MEMORANDUM**

SURRICK, J.                                                                                                    **July 25, 2024**

This employment discrimination case arises out of Plaintiff Christina Grasty's ("Plaintiff"

or "Grasty") former employment with Defendant Davita, Inc., d/b/a Davita South Broad Street

Dialysis ("Defendant" or "DaVita").  Plaintiff alleges that Defendant violated the Americans

with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, by failing to reasonably

accommodate her and firing her after she was injured at work.  (Compl., ECF No. 1, ¶¶ 9-25.)

Plaintiff asserts claims of disability discrimination, failure to accommodate, and retaliation.  (*Id.*,

¶¶ 14-17, 20-24.)  Presently before the Court is the Motion of Defendant Renal Treatment

Centers – Northeast, Inc. for Summary Judgment.  (Mot., ECF No. 30-1.)  For the following

reasons, Defendant's Motion will be granted in part and denied in part.  The Clerk of Court is

directed to mark this matter closed.

## I.      BACKGROUND

Defendant provides outpatient kidney dialysis services for patients suffering from chronic

kidney failure.  (Black Decl., ECF No. 30-3, Ex. B, ¶ 5.)  Plaintiff worked at Defendant for

approximately seven years as a dialysis technician, or Patient Care Technician, from February

2013 through February 2020.  (Plaintiff's Rog. Response, ECF No. 34-1, Ex. A, at 1; Job

Description, ECF No. 30-3, Ex. F, at 135 (ECF pagination); Internal Records re C. Grasty's

Employment, ECF No. 30-3, Ex. I, at 2.)  During the timeframe at issue in this lawsuit, Plaintiff

was supervised by Karen Black from June 17, 2018, to June 15, 2019, and by Nora Marinaccio

from June 16, 2019, to February 3, 2020, when she was terminated.  (Black Dep. Tr., ECF No.

30-3, Ex. D, at 30:6-13; Marinaccio Decl., ECF No. 30-3, Ex. E, ¶¶ 3-5, 7; Internal Records re C.

Grasty's Employment at 2.)  Black and Marinaccio both served as the Facility Administrator

when Plaintiff reported to them.  (Black Dep. Tr. at 18:3-15; Marinaccio Decl., ¶¶ 3-4.)  From

approximately June 2018 through February 2020, Plaintiff primarily worked at Defendant's

South Broad Street Dialysis facility, at 1172 South Broad Street, Philadelphia, Pennsylvania.

(Black Decl., ¶ 4; Grasty Dep. Tr., ECF No. 30-3, Ex. F, at 62:8-10.)

 Patient Care Technicians assist registered nurses in providing dialysis treatment.  (Job

Description at 135.)   Among other physical demands and responsibilities, Patient Care

Technicians must be able to lift between 5 to 50 pounds unassisted, perform repetitive standing,

sitting, stopping, walking, stretching, and reaching motions, and use their full range of body

motions.  (*Id*. at 136.)

 Plaintiff signed a "Teammate Code of Conduct Attestation" certifying that she received

Defendant's Code of Conduct and Policies and Procedures and agreed to comply with them.

(Teammate Code of Conduct Attestation, ECF No. 30-3, Ex. F, at 139 (ECF pagination).)

Defendant's "Standards of Performance" policy specifies that all teammates are expected "to

conduct themselves professionally and to diligently perform their duties."  (Work Environment

Policy, ECF No. 30-3, Ex. J, at 208 (ECF pagination).)  "Teammates are expected to maintain

appropriate, respectful working relationships with one another, as well as with patients,

physicians and suppliers."  (*Id*.)  Under Defendant's Anti-Violence Policy, "using threatening or

abusive language" or "engaging in any behavior that imperils the safety or health of teammates,

patients or others" is prohibited.  (Anti-Violence Policy, ECF No. 30-3, Ex. K, at 210-11 (ECF pagination).)

Defendant's "Conduct, Counseling and Corrective Action" policy specifies the corrective actions that may be imposed if a teammate fails to meet expectations and abide by Defendant's policies and guidelines.  (Work Environment Policy at 207.)  It states that:

> DaVita requires all teammates to conduct themselves in an appropriate and professional manner, to perform job responsibilities in a satisfactory manner and to abide by all [of] DaVita policies and guidelines.  If a teammate fails to meet these expectations, corrective action may be taken. . . .
>
> DaVita reserves the right to counsel or discipline teammates.  Depending on the circumstances, discipline may include verbal warnings, written warnings, suspension or termination of employment.

(*Id*.)  In particular, "a verbal warning may be used to address problems with a teammate's job performance.  Verbal warning documentation is placed into the teammate's personnel file." (*Id*.) "A written corrective action (including written final warning) may be used to address recurring problems or a problem of a more serious nature, and is also placed into the teammate's personnel file."  (*Id*. at 207-08.)  "Suspension may be initiated as further disciplinary action or implemented while an investigation is being conducted."  (*Id*. at 208.)  Lastly, "[t]ermination of employment may occur at any time."  (*Id*.)

The policy specifies that "DaVita may initiate or impose discipline at the level it believes, in its sole discretion, is most appropriate.  DaVita may terminate any teammate's employment relationship without following any particular series of steps whenever it determines, in its sole discretion, that termination of employment is in DaVita's best interest."  (*Id*.; *see also* Black Dep. Tr. at 31:4-10; Marinaccio Dep. Tr., ECF No. 30-3, Ex. C, at 53:3-6.)

Plaintiff received multiple disciplinary infractions prior to being terminated in February 2020.  On February 20, 2019, Black issued a Written Warning to Plaintiff for not following

3

Defendant's infection control policies and eating, drinking, and using her phone on the floor in violation of Defendant's policy.  (Universal Corrective Action Form, ECF No. 30-3, Ex. F, at 176-80 (ECF pagination); Grasty Dep. Tr. at 98:18-100:16.)  Around September 16, 2019, Marinaccio issued Plaintiff a Documented Verbal Warning for using her laptop on the floor to watch movies during a shift, swearing at a patient, speaking to teammates and patients in a rude manner, and drinking and eating on the floor after being warned that she could not do so. (Marinaccio Decl., ¶ 8; Universal Corrective Action Form at 181; Incident Report/Verbal Warning Documentation, ECF No. 30-3, Ex. F, at 183 (ECF pagination); Grasty Dep. Tr. at 40:2-41:16, 102:3-103:23.)  The written discipline followed earlier incidents in which Marinaccio saw Plaintiff acting unprofessionally to patients and watching movies on her laptop during shifts.  (Marinaccio Dep. Tr. at 30:4-23; *see also* Black Dep. Tr. at 31:15-23.)  Marinaccio testified that she ultimately disciplined Plaintiff in writing because she kept raising the behavior to Plaintiff but "it wasn't changing her attitude towards it."  (Marinaccio Dep. Tr. at 30:20-23.) On October 14, 2019, Marinaccio escalated the Documented Verbal Warning to a Final Written Warning, in consultation with Teammate Relations.  (Marinaccio Decl., ¶ 11; Universal Corrective Action Form at 181-82; Grasty Dep. Tr. at 93:21-94:23; Work Performance: Inappropriate Conduct, ECF No. 30-3, Ex. N, at 223-226 (ECF pagination).)  Plaintiff testified that she understood that after the Final Written Warning, she could be suspended or terminated if anything else occurred.  (Grasty Dep. Tr. at 94:13-20.)

On Saturday, January 11, 2020, Plaintiff injured herself at work.  As Plaintiff was putting a patient in a chair using a Hoyer lift, the lift was stiff, and she tried three times and with difficulty to use it.  (Teammate Incident Report, ECF No. 30-3, Ex. F, at 174 (ECF pagination).) In doing so, she pulled her back, shoulders, and neck.  (*Id*.)  Her arms were sore, and she

reported that it was very painful for her to lift them.  (*Id*.)  That day, Plaintiff texted Marinaccio and informed her that she hurt her back while using a Hoyer lift to transport a patient and was in pain.  (Marinaccio Dep. Tr. at 23:5-24:1; Jan. 11, 2020 text message, ECF No. 303-3, Ex. T, at 240 (ECF pagination); Grasty Dep. Tr. at 84:14-24.)

Marinaccio testified that she did not remember whether Plaintiff said at the time of the accident whether "she wasn't able to do anything specific," but she recalls Plaintiff mentioning that she was in pain.  (Marinaccio Dep. Tr. at 23:18-24:1.)  Marinaccio recalled that she asked Plaintiff if she was comfortable finishing her shift that day, and that Plaintiff said that she was.  (*Id*. at 24:15-20.)  Marinaccio asked Plaintiff whether she could work the subsequent shifts that she was assigned and told Plaintiff that after she was seen by a medical professional, they "can talk about what you can do on the floor so that you're not out of work, but you can still perform some job duties."  (*Id*. at 24:23-25:9.)

The following Monday, on January 13, 2020, Plaintiff visited the Emergency Department at Jefferson Hospital, and a doctor's note authorized Plaintiff to return to work on January 16, 2020.  (Jan. 13, 2020 medical records, ECF No. 30-3, Ex. U, at 247 (ECF pagination); Jan. 13, 2020 Jefferson Health letter, ECF No. 30-3, Ex. V, at 249 (ECF pagination); Grasty Dep. Tr. at 85:1-17.)

A note from a January 21, 2020 doctor's visit described Plaintiff's symptoms as follows:

Complaint of neck pain.  Symptoms are improving and [m]inimal.  The pain is located in the posterior neck bilaterally.  The symptoms occur intermittently.  She described her pain as aching in nature.  The severity of the pain is severe.  She has a current pain level of 8/10.  The paint radiates to the shoulders bilaterally.  Associated symptoms include decreased neck range of motion, shoulder pain, and upper extremity paresthesias. . . . There is bilateral upper back pain.  There is bilateral mid back pain. . . . Exacerbating factors include bending, lifting, and twisting.

5

(Jan. 21, 2020 Concentra Note, ECF No. 30-3, Ex. F, at 173 (ECF pagination); *see also* Additional notes from Jan. 21, 2020 Concentra visit, ECF No. 30-3, Exs. W, X.)  Plaintiff self-reported at the appointment that she was on light duty since the time of her injury.  (*Id*.)

> Under its reasonable accommodation policy, DaVita:
>
> Will reasonably accommodate the disabilities of qualified applicants and teammates after engaging in a timely, good faith interactive process.  DaVita is committed to making reasonable accommodations . . . unless doing so would impose an undue hardship or create a direct threat. . . . DaVita expects all teammates to assist and cooperate with making any reasonable accommodations.

(Policy Excerpt, ECF No. 30-3, Ex. G, at 186 (ECF pagination).)

Notes from Plaintiff's visits with a medical provider in January 2020 stated that Plaintiff "may bend occasionally," but she was advised "[n]o lifting, pushing/pulling patients."  (Jan. 24, 2020 Concentra Note, ECF No. 34-1, Ex. C, at 139 (ECF pagination); Jan. 24, 2020 Concentra Note, ECF No. 30-3, Ex. Y, at 258 (ECF pagination); Jan. 21, 2020 Concentra Note, ECF No. 30-3, Ex. W, at 254 (ECF pagination).)

Plaintiff testified that she was in pain when she returned to work.  (Grasty Dep. Tr. at 86:20-87:3.)  She was able to perform some portions of her job, but could not lift, push, or pull, Plaintiff testified.  (*Id*. at 19:5-12, 87:4-8.)

Plaintiff continued to see a medical provider when she returned to work.  In a note from a January 28, 2020 visit, Plaintiff's medical provider noted that Plaintiff presented symptoms that are consistent with a "cervical and thoracic strain" and that "some examination [was] limited due to high irritability level and pain focused presentation."  (Jan. 28, 2020 Concentra Note, ECF No. 30-3, Ex. Z, at 262 (ECF pagination).)  "Patient will benefit from skilled physical therapy to address [the] above impairments and meet functional goals."  (*Id*.)

Plaintiff testified that she understood that her light duty at work consisted of "no lifting, no pushing and pulling of patients." (Grasty Dep. Tr. at 16:24-17:2.) She stated that "[w]hen I expressed to them the conditions of light duty, it sounded like it was a problem," and she said that Marinaccio responded, "Well, we'll see what we can do." (*Id*. at 17:22-24, 18:1-9.) Meanwhile, Plaintiff testified that once she returned to work she got assistance to lift, pull and push "if it was available. If I didn't, I told the nurse, and they either, [] swapped the patient or I just told them I couldn't do it." (*Id*. at 87:9-13.) To Plaintiff's knowledge, if she told a nurse that she couldn't lift, push, or pull a patient, the nurse would take care of it and the patient would be cared for. (*Id*. at 87:14-21.)

In answering an interrogatory, Plaintiff stated that her supervisor "told Plaintiff she would put Plaintiff on light duty after receiving the light duty note, but failed to do so and had Plaintiff do her regular work instead. Shortly thereafter, Plaintiff was terminated." (Plaintiff's Answers to Def.'s Interrogatories, ECF No. 30-3, Ex. F, at 2.)

Marinaccio testified that when Plaintiff returned to work, "she did not voice that she needed to be accommodated for any more limitations." (Marinaccio Dep. Tr. at 25:23-26:1.) Marinaccio testified that "there was no note to say that [Plaintiff] needed to be on light-duty, but I was mindful of the fact that she had hurt herself previously, so I would ask her, are you okay working, do you feel comfortable doing the job duties, and she said yes." (*Id*. at 26:5-11.) When asked if Plaintiff ever told her that "there was anything that she couldn't do after she got back to work," Marinaccio testified "just maybe lifting something too heavy, like bending over." (*Id*. at 26:12-16.) When Plaintiff told Marinaccio that she couldn't lift something, Marinaccio "just told her to tell somebody else to lift something for her." (*Id*. at 26:17-21.)

Marinaccio testified that Defendant did not encounter any problems in fulfilling Plaintiff's accommodation requests: "If there was an issue with the schedule, we wanted to make sure that if she needed to be accommodated where she couldn't work, that there was somebody found to replace her, otherwise it would have been hard for me to just say you can just stay home." (*Id*. at 27:2-8.)

On the afternoon of January 23, 2020, Marinaccio held a mandatory, all-teammate staff meeting, which approximately twelve of her direct reports, including Plaintiff, attended, on professionalism and other topics. (Marinaccio Decl., ¶¶ 12-13; Unemployment Hearing Tr., ECF No. 30-3, Ex. L, at 34:12-17; Marinaccio Dep. Tr. at 38:12-39.) At the meeting, a social worker, Morgan Duhe, addressed the group about the grievance process. (Duhe Statement, ECF No. 30-3, Ex. P, at 230 (ECF pagination); Jan. 28, 2020 email, ECF No. 30-3, Ex. Q, at 232 (ECF pagination); Jan. 28, 2020, 8:56 am email, ECF No. 30-3, Ex. R, at 234 (ECF pagination).) She attempted to explain to the group "without singling any person out" that the "grievance process is a mandated activity and that grievances at [the] facility must be recorded and investigated appropriately." (Duhe Statement.) As Duhe spoke, Plaintiff screamed at her, swore at her using the F-word, and "directed threatening body language" at her. (Duhe Statement; Marinaccio Dep. Tr. at 38:21-39:12, 40:17-23.) Plaintiff sat less than two feet away from Duhe, and Plaintiff "lean[ed] in and point[ed] her finger at [Duhe] in a downward motion." (Jan. 28, 2020, 8:56 am email.) Plaintiff accused Duhe of almost getting her fired after an incident in which she swore at, screamed at, and threated a patient. (*Id*.) Marinaccio tried to get Plaintiff to stop screaming and pointing at Duhe, but Plaintiff would not stop. (*Id*.) Marinaccio stopped the meeting and told Plaintiff that she must leave the room. (Marinaccio Dep. Tr. at 39:12-14.) Plaintiff left the meeting in an angry fashion. (*Id*.; *see also* Jan. 23, 2020 Corrective Action, ECF

8

No. 30-3, Ex. S, at 236-37 (ECF pagination).)  According to Marinaccio, Plaintiff did not apologize for how she acted at the meeting.  (Marinaccio Dep. Tr. at 53:20-23.)

After the meeting, Marinaccio spoke to Plaintiff privately and informed her that her conduct was inappropriate and that "we would further discuss next steps."  (Marinaccio Decl., ¶ 14.)  Marinaccio wrote up a discipline infraction for Plaintiff, which was escalated to the Regional Operations Director and Teammate Relations, and ultimately led to her termination.  (Marinaccio Dep. Tr. at 42:8-16, 45:16-17.)  Even though DaVita has a progressive discipline policy, Marinaccio believed that this infraction warranted skipping steps because of "the way that [Plaintiff] unprofessionally talked to the social worker to the point where the social worker felt threatened."  (*Id*. at 53:7-18.)  Marinaccio testified that Plaintiff "needed to know what [she] needed to do to let her go because [she] wasn't going to give [Plaintiff] another chance to act the same."  (*Id*. at 44:21-45:4.)  Marinaccio discussed with Teammate Relations that Plaintiff had previously been written up and warned for unprofessional behavior.  (*Id*. at 44:21-45:4.)  The Regional Operations Director, Christine Joe, approved Plaintiff's termination.  (*Id*. at 46:4-7.)

Following the January 23, 2020 staff meeting, Marinaccio collected a statement from Duhe but did not collect one from Plaintiff.  (*Id*. at 44:1-7.)  According to Marinaccio, "[t]here was no statement to be given [from Plaintiff.]  Everybody [] including myself[] witnessed everything that happened."  (*Id*. at 44:9-11; *see also* Grasty Dep. Tr. at 124:8-23.)  Marinaccio was not aware whether Joe obtained a statement from Plaintiff or interviewed any witnesses. (Marinaccio Dep. Tr. at 46:4-22.)  Marinaccio testified that when discussing terminating Plaintiff with Joe, she did not raise that Plaintiff had recently been injured on the job, took time off as a result, or requested a reasonable accommodation.  (*Id*. at 46:23-47:4; 47:15-48:21.)  She "just discussed that [Plaintiff] had previously acted unprofessionally."  (*Id*. at 47:4-6.)  "The only time

I brought up that [Plaintiff] was injured on the job was when she got injured and I needed to know what document I needed to fill out for her injury." (*Id*. at 47:7-14.)

Between seven and eleven days after the staff meeting, Marinaccio called Plaintiff into her office and told her that she was being fired and provided her a termination letter. (Grasty Dep. Tr. at 111:22-112:12, 112:19-22; Feb. 3, 2020 Lttr, ECF No. 30-3, Ex. F, at 184 (ECF pagination).) Marinaccio's boss and a nurse named Sam were present in Marinaccio's office during the conversation. (Grasty Dep. Tr. at 112:5-6.) Plaintiff testified that she was terminated "seven days to be exact" after the staff meeting (*Id*. at 111:22-12:1), but the termination letter is dated February 3, 2020, or eleven days after the meeting. (Feb. 3, 2020 Lttr.) The termination letter states that "[t]his letter is to notify you that your employment with DaVita is being terminated effective 02/03/2020" and was signed by Marinaccio. (*Id*.)

Marinaccio testified that Plaintiff was terminated for "acting unprofessionally," and that the "last straw was acting unprofessionally towards [a] team member." (Marinaccio Dep. Tr. at 27:12-16; *see also* 48:13-24.) This was not the first time Marinaccio considered firing Plaintiff. Marinaccio almost terminated Plaintiff before her work injury, on December 13, 2019, but she chose not to proceed due to the holiday season and staffing shortages. (Marinaccio Decl., ¶¶ 16-17; Dec. 13, 2019 email, ECF No. 30-3, Ex. O, at 228 (ECF pagination).)

Plaintiff testified that at the meeting she was not told why she was terminated—"they didn't have to" —and she did not remember the reason if any given for her termination. (Grasty Dep. Tr. at 27:3-5, 123:16-22.) She acknowledged that she was not told that she was terminated because of her restrictions after her injury. (*Id*. at 123:16-124:6.) Plaintiff also suspected that Duhe didn't like her: "I just think she – I don't know, whatever reason, I don't think she liked me." (*Id*. at 124:23-125:8.)

Plaintiff testified that she believed that her termination was discipline for not lifting, pulling or pushing: "I got hurt, and I was still working for the company, but once they realized I had a workmen's comp case I believe they terminated me for that because they didn't want to accommodate me as far as my knees once I was actually hurt.  I was supposed to be on light-weight duty."  (*Id*. at 16:17-23, *see also* 19:13-15.)  "Once I got hurt, I was treated differently" as "they didn't want to accommodate me for my being hurt. . . . I wasn't supposed to be lifting, pushing or pulling patients."  (*Id*. at 17:12-19, 18:19-23.)

Marinaccio testified that Plaintiff did not tell her at any point that she felt that she was discriminated against because of her work injury.  (*Id*. at 53:24-54:3.)  Marinaccio stated in a declaration that she never viewed or perceived Plaintiff as having a disability based on her workplace restrictions following her January 11, 2020 injury at work.  (Marinaccio Decl., ¶ 18.)  Instead, she viewed Plaintiff's injury and restrictions to be transitory and minor.  (*Id*., ¶ 19.)  In addition, Marinaccio considered workplace restrictions such as limits on lifting to be common for staff members.  (*Id*., ¶ 20.)

Plaintiff testified that at the time of her termination, she suffered from "nerve damage, bulging discs," left and right shoulder pain, and lower back pain.  (Grasty Dep. Tr. at 74:8-75:6.)  She maintained that, as of the date of her deposition in 2022, she still suffers from nerve damage.  (*Id*. at 75:15-16.)  It impacts her "every day.  I might wake up in the morning and be in so severe damage that I have massive headaches in the middle of my head and the back of my head, and that's from the actual nerve damage, as well as . . . neck pain and my shoulder pain."  (*Id*. at 75:18-23.)  "So sometimes I can't go to work.  I have to lay in the bed or I have to sit a certain way, and it just comes on sporadically.  It happens whenever."  (*Id*. at 75:23-76:2.)  Plaintiff testified that she continued to be affected by her building disc issues: "Everyday activities no

matter what I'm doing.  Work.  Anything.  Going up and down the steps.  All the daily activities." (*Id*. at 78:19-79:1.)  Plaintiff was not hospitalized for the nerve damage or bulging discs.  (*Id*. at 76:3-5, 78:9-11.)  After the injury in 2020, Plaintiff was prescribed Percocet, Flexeril, and Ibuprofen, and at the time of her deposition, she continued taking Motrin or Advil. (*Id*. at 76:6-22.)

After Plaintiff was terminated by Defendant, she continued to seek medical treatment for her workplace injury.  In visits with a spinal care specialist, Plaintiff reported mid and low back, hand, shoulder and neck pain, and headaches.  (Note from Feb. 12, 2020 Spinal Care visit, ECF No. 34-1, Ex. B, at 10 (ECF pagination).)  An MRI of Plaintiff's cervical spine on February 26, 2020, showed some disc degeneration, protrusion, and bulging, and Plaintiff sought treatment from a chiropractor and a massage therapist.  (Feb. 26, 2020 MRI Report, ECF No. 34-1, Ex. B, at 8 (ECF pagination); Reports from Spinal Care LLC, ECF No. 34-1, Ex. B, at 10-137 (ECF pagination).)  A physician recommended surgery, but Plaintiff declined it.  (Grasty Dep. Tr. at 78:2-8.)

Defendant settled Plaintiff's workers' compensation claim.  (Compromise and Release Agreement by Stipulation, ECF No. 30-3, Ex. F at 122 (ECF pagination); Grasty Dep. Tr. at 27:14-28:13.)  In her initial filing with the Commonwealth of Pennsylvania Department of Labor and Industry, Plaintiff wrote that she was "still unsure" what rule she violated at Defendant, and as for why she was terminated, she wrote "I have no choice – I was hurt on the job."  (Internet Initial Claims, Pennsylvania Dept. of Labor and Industry, ECF No. 30-3, Ex. CC, at 273-74 (ECF pagination).)  "I was hurt on the job in 1/11/20 and have been on light duty since the 16th of January – now I just got fired all of a sudden," she wrote.  (*Id*. at 277.)  Plaintiff testified that

she had not seen a doctor for her nerve damage, bulging disc, or shoulder pain since settling her workers compensation case.  (Grasty Dep. Tr. at 80:12-81:2.)

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "[A] factual dispute is material only if it might affect the outcome of the suit under governing law."  *Id.*  The court must view the evidence in the light most favorable to the non-moving party.  *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).

Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c); *see also Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.  "[U]nsupported assertions, conclusory allegations, or mere suspicions" are insufficient to overcome a motion for summary judgment.  *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F.

13

Supp. 2d 490, 493 (E.D. Pa. 2010) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989)).  "Where a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law.  *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

## III.   DISCUSSION

### A.   Disability Discrimination

Defendant's Motion with respect to whether Plaintiff was regarded as disabled and was subjected to an adverse employment decision as a result of discrimination is granted. Defendant's Motion with respect to the *McDonnell Douglas* burden-shifting analysis is also granted.  However, genuine issues of material fact preclude summary judgment as to whether Plaintiff had an actual disability under the ADA.

The ADA states that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  To establish a *prima facie* claim of disability discrimination under the ADA, "a plaintiff must show (1) that he is disabled within the meaning of the ADA, (2) that he is otherwise qualified for the job, with or without reasonable accommodations, and (3) that he was subjected to an adverse employment decision as a result of discrimination."  *Sulima v. Tobyhanna Army Depot*, 602 F. 3d 177, 185 (3d Cir. 2010). Defendant argues that Plaintiff cannot establish the first and third elements of the claim.  (Mot. at 21.)

As an initial matter, Plaintiff argues that she can proceed under a mixed motive or pretext theory to prove causation "because she has presented a different set of facts that call into question the legitimate non-discriminatory reason for her termination." (Opp'n, ECF No. 34, at 11 (ECF pagination).) Under a mixed motive analysis, "where there is strong evidence of an employer's discriminatory animus, the burden of proof shifts from the plaintiff to the employer to prove that its motives for the employment action were 'mixed'—that is, while some motives were discriminatory, the employer had legitimate non-discriminatory motives as well which would have resulted in the adverse employment action." *Buchsbaum v. Univ. Physicians Plan*, 55 F. App'x 40, 45 (3d Cir. 2002). However, this analysis is only available when an employee produces direct evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption from the *prima facie* case to shift the burden of production." *Buchsbaum*, 55 F. App'x at 45 (citation omitted). Direct evidence "requires 'conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude.'" *Starceski v. Westinghouse Electric Corp.,* 54 F.3d 1089, 1096 (3d Cir. 1995) (citation omitted). Here, Plaintiff has not put forth direct evidence of discrimination and has misstated the standard to avail herself of the mixed motive theory of liability.

In the absence of direct evidence, courts apply the burden-shifting paradigm set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973), to analyze disability discrimination claims under the ADA. *See Sampson v. Methacton Sch. Dist.*, 88 F. Supp. 3d 422, 434 (E.D. Pa. 2015). Once a plaintiff presents a *prima facie* case, the burden shifts to the defendant to proffer a "legitimate, non-discriminatory reason" for Plaintiff's termination. *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) (citation omitted). If the defendant carries that

burden, the plaintiff then must establish that the defendant's proffered reason is pretext for discrimination.  *Id.*

### 1.  *Prima Facie Claim*: *ADA Qualifying Disability*

Genuine issues of material fact preclude summary judgment on Defendant's claim that Plaintiff did not have an actual disability under the ADA.  The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual," "a record of such an impairment," or when an individual is "regarded as having such an impairment[.]"  42 U.S.C. § 12102(1).  "Major life activities" include but are not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working."  *Id.*, § 12102(2)(A).  "[A] major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."  *Id.*, § 12102(2)(B).

The ADA does not define the phrase "substantially limits."  Under 29 C.F.R. § 1630.2(j)(1)(ii), "[a]n impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity *as compared to most people in the general population*."  (emphasis added.)  "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."  *Id*.  Neither the terms "substantially limits" nor "major life activities" of the ADA are meant to impose demanding standards.  *Id*., §§ 1630.2(i)(2), (j)(2).

"[I]n determining whether [a plaintiff] qualifies as disabled under the ADA, the issue is not whether [the plaintiff] could perform the functions of [their] job, but whether [they] suffered

from an impairment that substantially limited a major life activity." *Lindsey v. St. Mary Medical Ctr.*, No. 14-4265, 2016 WL 878307, at *16 (E.D. Pa. Mar. 7, 2016); *see also Eastman v. Research Pharm., Inc.*, No. 12-2170, 2013 WL 3949236 at *10 (E.D. Pa. July 31, 2013) ("[A]lthough plaintiff may have been able to drive and work, plaintiff put forth evidence from which a factfinder could reasonably conclude that these activities were more difficult for her as compared to most people in the general population because they caused her significant pain."). "[T]he determination of whether a person was a 'qualified individual with a disability' for the purposes of an ADA claim is" assessed at "the point at which the alleged discriminatory decision was made." *Bowers v. NCAA*, 475 F.3d 524, 535-36 (3d Cir. 2007).

On this record, Plaintiff has offered sufficient evidence to raise a genuine issue of material fact as to whether she was disabled when she was terminated. Plaintiff testified that she was not able to perform the lifting, pushing, and the pulling aspects of her job when she returned from work after her January 11, 2020 injury, which occurred approximately three weeks before she was fired. (Grasty Dep. Tr. at 87:4-13.) She described experiencing "nerve damage" and "bulging discs," and testified at her deposition on May 9, 2022, that she continued to have pain for which she sometimes had to miss work. (*Id*. at 27:17-19, 75:2-76:2.)

Plaintiff's testimony was corroborated by medical records. For example, notes from Plaintiff's doctor visit on January 21, 2020, described the "severity of the pain" as "severe." (Jan. 21, 2020 Concentra Note at 173.) Plaintiff was prescribed a muscle relaxant and physical therapy, and notes from a doctor's visit on January 28, 2020, state that Plaintiff described experiencing "burning and sharp" pain, "numbness, [and] radiating tingling," among other symptoms. (*Id*. at 253; Jan. 28, 2020 Concentra Note at 265-68.) An MRI of Plaintiff's cervical spine on February 26, 2020, showed some disc degeneration and bulging, and Plaintiff sought

17

treatment from a chiropractor.  (Feb. 26, 2020 MRI Report at 8; Reports from Spinal Care LLC at 10-137.)  Surgery was recommended but Plaintiff declined it.  (Grasty Dep. Tr. at 78:2-8.) Accordingly, Plaintiff has presented sufficient evidence for a jury to conclude that at the time of her termination she suffered from pain and back issues that limited her ability to lift, push, and pull as compared to most people in the general population.  *See Cohen v. CHLN, Inc.*, No. 10-00514, 2011 WL 2713737, at *7 (E.D. Pa. July 13, 2011) (holding that a plaintiff defeated summary judgment when they relied on their testimony and medical records to raise a genuine issue of material fact that they were disabled); *see also Canevari v. Itoh Denki U.S.A., Inc.*, No. 15-1449, 2017 WL 4080548, at *7-8 (M.D. Pa. July 24, 2017) (holding that "plaintiff's attestations regarding his medical condition" and medical records "support the plaintiff's contention that he suffered from a physically disabling condition").

Defendant argues that Plaintiff cannot establish that she was disabled as a matter of law because her injury was temporary and there is no medical evidence to support her claim that she suffered "nerve damage."  (Mot. at 22-24.)  According to Defendant, medical evidence shows that Plaintiff sustained injuries to her "neck, bilateral upper extremity radiculopathy, headaches, bilateral shoulders, upper and mid back," but Plaintiff was only treated for a six-months period. (*Id.*)  Defendant maintains that Plaintiff's deposition testimony that she still suffers from pain does not establish that Plaintiff is disabled under the ADA when she has not sought treatment for any alleged pain in multiple years.  (*Id.*)

However, Defendant has imposed a standard of disability more stringent than the one imposed by the ADA as amended by the ADA Amendments Act of 2008.  *See Cohen*, 2011 WL 2713737, at *7-8.  "The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA" and "is not

18

meant to be a demanding standard."  29 C.F.R. § 1630.2(j)(1)(i).  Unlike Defendant's position

that Plaintiff was not disabled because her injuries were allegedly temporary, "the ADAAA

mandates no strict durational requirement for plaintiffs alleging an actual disability," and a jury

could interpret the evidence in the record to conclude that Plaintiff's condition was not fleeting.

*See Cohen*, 2011 WL 2713737 *8; *see also* 29 C.F.R. § 1630.2(j)(1)(ix).  Defendant argues that

Plaintiff cannot have an ADA-qualifying disability when she has allegedly not sought medical

treatment in recent years, but "[t]he determination of whether an impairment substantially limits

a major life activity shall be made without regard to the ameliorative effects of mitigating

measures," 29 C.F.R. § 1630.2(j)(1)(vi), and Plaintiff's disability status is measured at the time

of her termination.  *Bowers*, 475 F.3d at 535-536.  Accordingly, the record includes sufficient

evidence from which a reasonable factfinder could conclude that Plaintiff had a disability under

the ADA to survive summary judgment.

### 2.  *Prima Facie Claim*: *Regarded as Disabled*

Plaintiff has not offered sufficient evidence to raise a genuine issue of material fact that

she was regarded as disabled.  An individual is disabled under the ADA when they are "regarded

as having such an impairment[.]"  42 U.S.C. § 12102(1).  An individual must establish[] that

[they have] been subjected to an action prohibited under the ADA because of an actual or

perceived physical or mental impairment[,] whether or not the impairment limits or is perceived

to limit a major life activity."  *Eshleman v. Patrick Indus., Inc.*, 961 F.3d 242, 245 (3d Cir. 2020)

(citing 42 U.S.C. § 12102(3)(A)).  The ADA "limits 'regarded as' claims by excluding

'impairments that are transitory and minor.'"  *Eshleman*, 961 F.3d at 246 (quoting 42 U.S.C. §

12102(3)(B)).

Under the ADA, "transitory" is "an impairment with an actual or expected duration of six months or less."  42 U.S.C. § 12102(3)(B).  "The ADA does not define 'minor.'" *Baker v. City of Washington, Pennsylvania*, No. 19-113, 2021 WL 2379709, at *12 (W.D. Pa. June 10, 2021).  "In determining whether an impairment is minor, courts inquire on a case-by-case basis into several factors including: the symptoms and severity of the impairment; the type of treatment required; the risk involved; whether any surgical intervention is anticipated or necessary; and the scope of post-operative care." *Baker*, 2021 WL 2379709, at *12 (citing *Eshleman*, 961 F.3d at 249).  "The mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that the perception caused the adverse employment action." *Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996) (citing *Chandler v. City of Dallas,* 2 F.3d 1385, 1393 (5th Cir.1993)).

Plaintiff's Complaint includes one reference to being regarded as disabled, as she states that she was "terminated because of her disability/perceived disability, in violation of the ADA." (Compl., ¶ 23.)  However, Marinaccio, who communicated with Plaintiff about her workplace injury and in conjunction with others made the decision to terminate Plaintiff, stated in a declaration that she never viewed or perceived Plaintiff as having a disability based on her workplace restrictions following her January 11, 2020 injury at work.  (Marinaccio Decl., ¶ 18.) Instead, she viewed Plaintiff's injury and restrictions as transitory and minor and considered workplace restrictions such as lifting restrictions to be common for staff members.  (*Id.*, ¶¶ 19-20.)  Plaintiff has not pointed to facts in the record to suggest otherwise.  In addition, Plaintiff's injury and reasonable accommodation request were not discussed when employees of Defendant discussed terminating Plaintiff and when they spoke to Plaintiff about their decision.  (*See* Marinaccio Dep. Tr. at 47:7-48:24; Grasty Dep. Tr. at 123:16-124:7.)

Defendant argues that Plaintiff was not regarded as disabled because Plaintiff's restrictions were not "accompanied with any degree of permanency," and that the record does not include any evidence to suggest that Defendant perceived Plaintiff to be disabled.  (Mot. at 28, 30-31.)  In her opposition, Plaintiff did not address Defendant's argument that she was not regarded as disabled.  (*See generally* Opp'n.)  Accordingly, Plaintiff has not presented a genuine issue of material fact to support that she was regarded as disabled, and Defendant is entitled to summary judgment as to this element.

### 3. *Prima Facie Claim*: *Causation*

Even assuming that Plaintiff had a qualifying disability or was regarded as disabled, Plaintiff has not offered sufficient evidence to raise a genuine issue of material fact that her termination was discriminatory.  To establish a prima facie claim of disability discrimination, a plaintiff must also establish "that [they were] subjected to an adverse employment decision as a result of discrimination."  *Sulima*, 602 F. 3d at 185.  A plaintiff must "show that [their] disability was a 'determinative factor' in the defendant's decision to terminate [their] employment." *Garrow v. Wells Fargo Bank, N.A.*, No. 15-1468, 2016 WL 5870858, at *8 (E.D. Pa. Oct. 7, 2016).  A plaintiff does not meet this standard when not only do they not provide evidence that their disability was a determining factor in their termination, but the "record is rife with evidence that [the plaintiff] was terminated for reasons that were wholly nondiscriminatory."  *See Garrow*, 2016 WL 5870858, at *9; *see also Willmore v. Am. Atelier, Inc.*, 72 F. Supp. 2d 526, 529 (E.D. Pa. 1999) ("[W]e find no evidence that the basis for plaintiff's termination was anything other than insubordination and threatening behavior to both a co-worker and a superior.").

The record is replete with evidence that Plaintiff was terminated for violations of Defendant's Code of Conduct and Anti-Violence Policy and for failing to act in a professional

manner.  While subject to a Final Written Warning, Plaintiff cursed and acted aggressively

towards a teammate during an all-team staff meeting.  (Duhe Statement; Jan. 28, 2020, 8:56 am

email; Jan. 23, 2020 Corrective Action at 236-37.)  Before the incident and prior to Plaintiff's

injury, Marinaccio had considered terminating Plaintiff for unprofessional conduct, and her

behavior at the staff meeting was the "last straw" that prompted her termination.  (Marinaccio

Decl., ¶¶ 16-17; Dec. 13, 2019 email at 228; Marinaccio Dep. Tr. at 27:12-16.)  Marinaccio and

Plaintiff agreed that Plaintiff's injury and workplace accident were not raised when Marinaccio

informed Plaintiff that she was being fired.  (*See* Marinaccio Dep. Tr. at 47:7-48:24; Grasty Dep.

Tr. at 123:16-124:7.)  Plaintiff has not pointed to evidence in the record besides her own

statements to suggest a different explanation for her termination.

Plaintiff raises multiple challenges to argue that her termination raises the inference of

discrimination (Opp'n at 11-12), none of which are availing.  She claims that deposition

testimony "paint[s] a much different picture of the meeting where she is accused of acting

unprofessionally."  (*See id*. at 12.)  However, Plaintiff does not identify passages in her

testimony that "paint a much different picture," point to evidence in the record to corroborate her

deposition testimony, or mitigate the contemporaneous witness statements and deposition

testimony in the record that describe how she cursed and acted unprofessionally at the staff

meeting prior to being fired.  When a plaintiff relies on their deposition testimony to defeat a

motion for summary judgment, "the issue is not whether [the plaintiff] has relied solely on [their]

own testimony to challenge the [m]otion[ ], but whether [the plaintiff s] testimony, when

juxtaposed with the other evidence, is sufficient for a rational factfinder to credit [the plaintiff's]

testimony, despite its self-serving nature."  *Johnson v. MetLife Bank, NA*, 883 F. Supp. 2d 542,

549 (E.D. Pa. 2012) (citing *Gonzalez v. Sec'y of Dep't. of Homeland Sec.*, 678 F.3d 254, 263 (3d

Cir. 2012)); *see also Levy v. UPS*, No. 19-23, 2020 WL 815028, at *3 (E.D. Pa. Feb. 18, 2020).  In opposing summary judgment, the non-moving party "cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument" and "must rebut the motion with facts in the record." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). Plaintiff has not met this standard.  Accordingly, Plaintiff's testimony is insufficient to raise a genuine issue of material fact.

Plaintiff also questions the thoroughness of Defendant's investigation that followed the January 23, 2020 staff meeting to cast doubt on Defendant's motive for terminating her.  (Opp'n at 12.)  Plaintiff maintains that there was "no real investigation into the incident that led to Plaintiff's termination," only the alleged victim gave a statement, neither Plaintiff nor witnesses provided any, and Plaintiff was not given an opportunity to tell her story.  (*Id*.)  However, a challenge to the adequacy or propriety of an investigation is insufficient to establish pretext, raise an inference of discrimination, or show that an employer acted with discriminatory animus.  *See, e.g.*, *Geddis v. Univ. of Delaware*, 40 F. App'x 650, 653 (3d Cir. 2002) ("[T]he lack of investigation alone does not establish that [defendant] fired [plaintiff] based on discriminatory reasons."); *see also Bloch v. Mack Trucks, Inc.*, 240 F. Supp. 3d 365, 375 (E.D. Pa. 2017) (summarizing case law concluding that "courts in this circuit have found challenges to the adequacy of an investigation [to be] insufficient to establish pretext"); *Epps v. First Energy Nuclear Operating Co.*, No. 11-1462, 2013 WL 1216858, at *29 (W.D. Pa. Mar. 25, 2013).

Next, Plaintiff argues that Defendant's decision to skip steps in its progressive discipline policy suggests that her termination was discriminatory.  (Opp'n at 12.)  Plaintiff disputes her discipline history, and claims that her "initial discipline" was "simply a verbal consult" and "[t]hen, with no investigation whatsoever, Defendant escalated this to a termination – skipping

steps in [its] progressive discipline policy." (*Id.*)  However, Defendant's discipline policy specifies that the company "may initiate or impose discipline at the level it believes, in its sole discretion, is most appropriate." (Work Environment Policy at 208.)  The policy allows Defendant to "terminate any teammate's employment relationship without following any particular series of steps whenever it determines, in its sole discretion, that termination of employment is in DaVita's best interest." (*Id.*)  While "unexplained 'disturbing procedural irregularities' may give rise to an inference of [discrimination]," this conclusion cannot be drawn when a policy does not dictate a "mandatory progressive discipline policy" and "reserve[s] the right to forgo progressive discipline" when an employer deems that termination is warranted. *See Timmerman v. U.S. Bank, N.A.*, No. 04-1903, 2006 WL 894894, at *3 (D. Colo. Mar. 31, 2006) (citation omitted); *see also Peterson v. Exide Tech.*, 477 F. App'x 474, 477-78 (10th Cir. 2012) (finding that a jury could not find pretext when the defendant had complied with its employee policy that allowed it to deviate from its progressive discipline policy); *Monroe v. City of Lawrence, Kan.*, 124 F. Supp. 3d 1097, 1118 (D. Kan. 2015) ("The policy language clearly indicates that progressive discipline is not required in all cases.")  Plaintiff has not raised a genuine issue of material fact because Defendant's policy specifically allows it to deviate from its progressive discipline policy if an employee's conduct warrants a departure.

Plaintiff also raises an issue with the timing of the events as "[a]ll of this occurred only weeks after Plaintiff's injury and reasonable accommodation." (Opp'n at 12.)  Plaintiff was injured on January 11, 2020, she returned to work on January 16, 2020, the staff meeting took place on January 23, 2020, and Plaintiff was terminated by February 3, 2020. (Teammate Incident Report at 174; Jan. 13, 2020 medical records at 247; Marinaccio Decl., ¶¶ 12-13; Feb. 3, 2020 Lttr at 184.)  However, we cannot infer a causal relationship based on temporal proximity

24

when events "'are separated by an intervening event that independently . . . caused the adverse action.'" *Houston v. Dialysis Clinic, Inc.*, No. 13-4461, 2015 WL 3935104, at *11 (D.N.J. June 26, 2015) (quoting *Mizusawa v. United States Dep't of Labor*, 524 F. App'x 443, 448 (10th Cir. 2013)); *see also Dewitt v. Sw. Bell Tel. Co.*, 41 F. Supp. 3d 1012, 1023 (D. Kan. 2014) ("evidence of temporal proximity has minimal probative value . . . where intervening events . . . provide a legitimate basis for the employer's action") (citation omitted); *Jacobs v. Johnson Storage & Moving Co. Holdings, LLC*, No. 18-24, 2020 WL 1031024, at *9 (E.D. Mo. Mar. 3, 2020) ("intervening events erode any causal connection suggested by temporal proximity") (citation omitted).  While Plaintiff was terminated approximately three weeks after her workplace injury, the January 23, 2020 staff meeting serves as an intervening event for which Defendant terminated Plaintiff.  (*See* Marinaccio Dep. Tr. at 27:12-16, 48:13-24.)  Accordingly, Plaintiff has not created a genuine issue of material fact, and summary judgment is granted with respect to the third prong of Plaintiff's disability discrimination claim.

4.   *Defendant has Proffered a Legitimate, Non-Discriminatory Reason for Plaintiff's Termination.*

If Plaintiff established a *prima facie* claim of discrimination, the burden shifts to Defendant to proffer a "legitimate, non-discriminatory reason" for Plaintiff's termination. *Shaner*, 204 F.3d at 500.  An employer has a "relatively light burden" to "introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

Defendant argues that even if Plaintiff could establish a *prima facie* case of discrimination, under the second prong of the *McDonnell Douglas* test, Defendant has a legitimate, non-discriminatory and non-retaliatory reason for Plaintiff's treatment as she was terminated because of repeated unprofessional, aggressive conduct in violation of Defendant's

25

employment policies.  (Mot. at 41-42.)  Plaintiff did not address this prong of the analysis.

(Reply Br., ECF No. 35, at 9; *see generally* Opp'n.)  The record is replete with evidence that

Plaintiff was terminated due to her conduct and policy violations.   Accordingly, Defendant has

met its burden at this stage of the analysis.

> ### 5. *Plaintiff has Not Demonstrated that Defendant's Reason for Terminating Plaintiff was Pretextual.*

After Defendant articulates a "legitimate, non-discriminatory reason" for Plaintiff's

termination, Plaintiff must then establish that Defendant's proffered reason is pretext for

discrimination.  *Shaner*, 204 F.3d at 500.  To defeat summary judgment, "the plaintiff must point

to some evidence, direct or circumstantial, from which a factfinder could reasonably either

disbelieve the employer's articulated legitimate reasons or believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause of the

employer's action."  *Fuentes*, 32 F.3d at 764.  Plaintiff has not met her burden.

"To discredit the employer's proffered reason, [] the plaintiff cannot simply show that the

employer's decision was wrong or mistaken."  *Id*. at 765 (citations omitted).  "Rather, the non-

moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that

a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the

employer did not act for the asserted non-discriminatory reasons."  *Id*.

Plaintiff's arguments with respect to this step of the analysis duplicate her arguments

regarding the third prong of her *prima facie* claim.  (*See* Opp'n at 12.)  Plaintiff argues that "[t]he

sequence of events, the relative temporal proximity, Plaintiff's version of events, the lack of any

real investigation, the inexplicable escalation of Plaintiff's discipline, and the disregard of the

progressive discipline policy" together "provide the type of inconsistencies and contradictions

that undermine the legitimate business reason for Plaintiff's termination." (*Id.*)  According to

Plaintiff, summary judgment for Defendant is improper because "[i]f the jury believes []

Plaintiff, then they could find that Defendant's given reason for Plaintiff's termination was

simply pretext." (*Id.*)  However, as analyzed above with respect to the third prong of Plaintiff's

*prima facie* claim, Plaintiff has not raised genuine issues of material fact to demonstrate that

Defendant's proffered explanation for her termination is pretextual.  Accordingly, summary

judgment with respect to Plaintiff's disability discrimination claim is granted.

### B.      Failure to Accommodate Claim

We also grant Defendant summary judgment with respect to Plaintiff's failure to

accommodate claim.  An employer violates the ADA by "not making reasonable

accommodations to the known physical or mental limitations of an otherwise qualified individual

with a disability . . . , unless such covered entity can demonstrate that the accommodation would

impose an undue hardship" to the employer.  42 U.S.C. § 12112(b)(5)(A).  A reasonable

accommodation includes "[m]odifications or adjustments to the work environment, or to the

manner or circumstances under which the position held or desired is customarily performed, that

enable an individual with a disability who is qualified to perform the essential functions of that

position."  29 C.F.R. § 1630.2(o)(1)(ii).  "To determine the appropriate reasonable

accommodation, it may be necessary for the covered entity to initiate an informal, interactive

process with the individual with a disability in need of the accommodation."  *Id.*, § 1630.2(o)(3).

"This process should identify the precise limitations resulting from the disability and potential

reasonable accommodations that could overcome those limitations."  *Id.*  "The interactive

process, as its name implies, requires the employer to take some initiative." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 315 (3d Cir. 1999).

"To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Taylor*, 184 F.3d at 319-20 (citation omitted).[1]  "An employer who acts in bad faith in the interactive process will be liable if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations." *Id.* at 317-18.

"[B]oth parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." *Id.* at 312 (quoting *Mengine v. Runyon*, 114 F.3d 415, 419-20 (3d Cir. 1997)).  Employers can demonstrate that they acted in good faith in multiple ways, including by showing that they "me[t] with the employee who request[ed] an accommodation, request[ed] information about the condition and what limitations the employee has, ask[ed] the employee what he or she specifically wants, show[ed] some sign of having considered employee's request, and offer[ed] and discuss[ed] available alternatives when the request is too burdensome." *Id.* at 317.  A party can act in bad faith by, for example, "obstruct[ing] or delay[ing] the interactive process," or "fail[ing] to communicate, by way of initiation or response." *Id.* at 312.  "[C]ourts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific

---

[1] Defendant analyzed Plaintiff's failure to accommodate claim under the third prong of a *prima facie* discrimination claim.  (Mot. at 31-33.)  Under Third Circuit precedent, we analyze Plaintiff's failure to accommodate claim as an independent ADA claim.  *See, e.g.*, *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504 (3d Cir. 2010); *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 187 (3d Cir. 2009).

accommodations are necessary." *Id.* (citation omitted).  "In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Id.*

Plaintiff maintains that genuine issues of material fact preclude summary judgment because "her job duties were unchanged and she was put in a position that violated her light duty work restrictions."  (Opp'n at 10.)  According to Plaintiff, at Marinaccio's deposition she "did not even recall whether there was a light duty restriction and testified that she could not remember any such note or documentation."  (*Id*.)  Plaintiff argues that a jury could infer from this testimony that her "light duty work restrictions were not taken seriously by Defendant," and that, in light of this evidence, Plaintiff's failure to accommodate claim should survive summary judgment.  (*Id*. at 10-11.)

Defendant argues that there is no evidence that Plaintiff was denied a reasonable accommodation during her employment with DaVita.  (Mot. at 40.)  When Plaintiff needed to push, pull or lift a patient, she would seek the assistance of another employee or another employee would handle those responsibilities.  (*Id*. at 41-42.)  Defendant claims that Plaintiff represented to several third parties that she received light duty work after her January 11, 2020 workplace injury.  (*Id*. at 42.)

It is undisputed that after Plaintiff's injury, she received medical instruction that she "may bend occasionally," but could not lift, push, or pull patients.  (Jan. 21, 2020 Concentra Note.)  Both Plaintiff and Marinaccio recognized this limitation.  (Marinaccio Dep. Tr. at 26:12-21; Grasty Dep. Tr. at 19:5-12, 87:4-8.)  Plaintiff testified that when presented with a need to lift, push, or pull a patient, a different teammate completed the task.  (Grasty Dep. Tr. at 87:9-21.)  In doing so, Plaintiff indicated that her inability to lift, push, or pull patients was accommodated and that patients' needs were attended to while she was limited.  While Plaintiff points to

Marinaccio's deposition testimony, in which she did not recall whether Plaintiff had a light duty restriction, to suggest that Defendant did not take Plaintiff's light duty work restrictions seriously (Opp'n at 10, *see also* Marinaccio Dep. Tr. at 23:18-24:1, 25:23-26:1, 26:5-11), this ex-post testimony does not undermine the parties' testimony that Plaintiff was provided an alternative when she could not lift, push or pull a patient.  Plaintiff testified that "[w]hen I expressed to them the conditions of light duty, it sounded like it was a problem," and she said that Marinaccio responded, "Well, we'll see what we can do." (Grasty Dep. Tr. at 17:22-24, 18:1-9.)  But Plaintiff has not explained how she was not accommodated when she agreed that she was presented with an alternative when she needed to complete the lifting, pushing, or pulling tasks that she physically could not do.  (*See Id*. at 87:9-21.)  Plaintiff has not presented evidence to suggest that Defendant "simply [sat] back passively," "offer[ed] nothing" in response to Plaintiff's request, and did not "ask[] [her] what . . . she specifically want[ed]." *Taylor*, 184 F.3d at 315, 317.  Accordingly, summary judgment as to Plaintiff's failure to accommodate claim is granted.

### C.    Retaliation Claim

Plaintiff alleges that she was terminated in retaliation for requesting a reasonable accommodation.  (Compl., ¶ 24.)  However, Plaintiff has not demonstrated that genuine issues of material fact preclude summary judgment, and we grant Defendant's Motion as to her retaliation claim.

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]."  42 U.S.C. § 12203(a).  "To establish a prima facie

case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F. 3d 494, 500 (3d Cir. 1997).   In the absence of direct evidence of retaliation, retaliation claims are analyzed under the *McDonnell Douglas* framework.  *See Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005).

   With regard to the first prong, Defendant does not challenge that Plaintiff engaged in protected activity when she requested a reasonable accommodation.  (*See* Mot. at 37-41.)  Requesting a reasonable accommodation is protected activity under the ADA.  *Sulima*, 602 F. 3d at 188.  "[A]n ADA retaliation claim does not require that the plaintiff demonstrate a disability within the meaning of the ADA, but only that the plaintiff has a 'reasonable, good faith belief that [he] was entitled to request the reasonable accommodation [he] requested." *Id*. at 188 (quoting *Williams v. Phil. Hous. Auth. Police Dept.*, 380 F. 3d 751, 759 n.2, *abrogated on other grounds*, *see Robinson v. First State Comm. Action Agency*, 920 F. 3d 182, 188 n.30 (3d Cir. 2019)).

   With regard to the second prong, Defendant does not challenge that Plaintiff's termination constitutes an adverse employment action.  (*See* Mot. at 37-41.)  "[F]or retaliation, adverse employment actions are construed more broadly than adverse employment actions for purposes of discrimination."  *Murphy v. Afnmazon Fulfillment Serv. Inc.*, No. 21-5622, 2022 WL 986264, at *4 (D.N.J. Apr. 1, 2022) (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006), *as amended* (Sept. 13, 2006)).   In the context of retaliation, an adverse employment action "is not limited to discriminatory actions that affect the terms and conditions of employment." *Moore*, 461 F.3d at 341 (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53,

64 (2006)).  Instead, a "plaintiff claiming retaliation . . . must show that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from'" engaging in protected activity.  *Id.* (citation omitted).

With regard to the third prong, Defendant maintains that Plaintiff cannot demonstrate a causal connection between requesting an accommodation and her termination.  (Mot. at 39-41.) A plaintiff may establish the requisite causal connection between a protected activity and an adverse employment action through either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."  *Oberdorf v. Penn Vill. Facility Operations, LLC*, No. 15-1880, 2017 WL 839470, at *3 (M.D. Pa. Mar. 3, 2017) (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).  In the absence of such evidence, a plaintiff can also satisfy this element if "from the 'evidence gleaned from the record as a whole,'" a trier of fact can infer causation.  *Oberdorf*, 2017 WL 839470, at *3 (quoting *Lauren W. ex rel. Jean W.*, 480 F.3d at 267).

Even if temporal proximity by itself is not unduly suggestive, courts find that this prong is met when "there is other evidence from which an inference of causation can be drawn." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr*, 691 F.3d 294, 307 (3d Cir. 2012); *see also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000) ("[T]iming plus other evidence may be an appropriate test where the temporal proximity is not so close as to be 'unduly suggestive.'").  For example, allegations suggest causation when a plaintiff was terminated approximately two weeks after filing an internal complaint with a company and they "alleged facts showing that [they] experienced antagonism and retaliatory animus after [their] complaints."  *See Sally-Harriet v. N. Child. Servs.*, No. 17-4695, 2019 WL 1384275, at *7 (E.D.

Pa. Mar. 26, 2019); *see also Schlichtig v. Inacom Corp.*, 271 F. Supp. 2d 597, 613 (D.N.J. 2003) (finding, on summary judgment, that a party established "an inference of causation" when he was terminated "approximately five to fifteen days" after he made a report to the police and there was "direct evidence" that the party's decision to involve the police was a basis for his termination); *Stull v. Leedsworld*, No. 17-378, 2018 WL 576241, at *2, 8 (W.D. Pa. Jan. 26, 2018) (holding that a plaintiff pled a plausible retaliation claim under Title VII when he alleged that he was fired within two weeks of filing complaints with Human Resources and he was routinely criticized for his age and subjected to ageist comments).

Defendant argues that the timing between her request for an accommodation and termination is not unusually suggestive as a matter of law.[2]  (Mot. at 39-40.)  According to Defendant, timing alone is usually insufficient to establish causation, and there is no evidence that "DaVita engaged in a pattern of antagonism during the intervening thirteen-day period" towards Plaintiff.  (*Id*.)  Defendant maintains that Plaintiff cannot show that the record as a whole infers causation.  (*Id*. at 40-41.)  Meanwhile, Plaintiff's arguments with respect to causation duplicate her causal arguments regarding her disability discrimination claim (*see* Opp'n at 12) and, as analyzed above, she has not demonstrated a genuine issue of material fact to defeat summary judgment.

Plaintiff was fired approximately three weeks after her workplace injury for which she requested the reasonable accommodation of "no lifting, pushing/pulling patients" and "occasional bending."  (Jan. 24, 2020 Concentra Note at 139.)  As analyzed above, there is ample evidence in the record that Plaintiff's modifications were accommodated, as other

---

[2] Defendant also argues that Plaintiff cannot establish as a matter of law that she was denied an accommodation and that such a supposed denial is an adverse employment action for purposes of her retaliation claim.  (Mot. at 38.)  This argument is not relevant because Plaintiff alleges that her termination—not the denial of her accommodation request—was retaliatory.  (Compl., ¶ 24.)

teammates performed the duties that she could not complete.  The all-teammate staff meeting at which Plaintiff intimidated and swore and yelled at a staff member occurred less than two weeks before her termination, and, as analyzed above, serves as an intervening event and the basis for her termination.  (*See* Marinaccio Decl., ¶¶ 12-13; Marinaccio Dep. Tr. at 27:12-16.)  "Inferring a causal relationship between the protected activity and the adverse action is not logical when the two are separated by an intervening event that independently . . . caused the adverse action." *Houston*, 2015 WL 3935104, at *11.  Besides noting the timing of Plaintiff's termination relative to her accommodations request, Plaintiff has not pointed to any additional "evidence from which an inference of causation can be drawn." *Lichtenstein*, 691 F.3d at 307.  Accordingly, Plaintiff has failed to satisfy the third prong of her *prima facie* claim and defeat summary judgment.

Even if Plaintiff could establish a *prima facie* retaliation claim, her claim cannot survive summary judgment as to the *McDonnell-Douglas* burden shifting analysis.  Defendant conducted the *McDonnell-Douglas* burden shifting analysis for Plaintiff's disability and retaliation claims together.  (Mot. at 42-44.)  As discussed above, Defendant has met its burden in establishing that it terminated Plaintiff for a legitimate, non-discriminatory and non-retaliatory reason.  Defendant argues that Plaintiff has not put forth any evidence that "DaVita intended to retaliate against Plaintiff in any way," and that "Plaintiff has not alleged anything other than her disagreement with the termination of her employment, which cannot form the basis for a finding of pretext." (*Id*. at 44.)  Plaintiff makes the same arguments as to pretext that she articulated regarding her disability discrimination claim (*see* Opp'n at 12.) and, as analyzed above, Plaintiff has not presented sufficient evidence to defeat summary judgment on this point.  As such, Defendant's Motion will be granted with respect to Plaintiff's retaliation claim under the ADA.[3]

---

[3] Because we grant Defendant's Motion, we need not address Defendant's arguments concerning damages, Plaintiff's entitlement to a jury trial, or Plaintiffs' demand for lost wages.  (*See* Mot. at 44-46.)

IV.      **CONCLUSION**

For the foregoing reasons, Defendant's Motion will be denied with respect to whether Plaintiff had a qualifying disability under the ADA.  However, it will be granted with respect to whether Plaintiff was regarded as disabled, causation, and the *McDonnell Douglas* burden shifting framework of Plaintiff's disability discrimination claim and Plaintiff's failure to accommodate and retaliation claims.  Accordingly, Plaintiff's claims will be dismissed, and the Clerk of Court is directed to mark this matter as closed.  An appropriate Order follows.

**BY THE COURT:**

*/s/ R. Barclay Surrick*
**R. BARCLAY SURRICK, J.**